1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  MOHAMED LASHEEN,
                                    NO. CIV. S-01-227 LKK/PAN
12          Plaintiff,

13      v.                                  O R D E R

14  THE LOOMIS COMPANY, et al.,

15          Defendants.
    _____/

16

17      The plaintiff's estate has sued defendant, The Loomis

18  Company, under ERISA and California law for benefits allegedly

19  owed the decedent under a medical benefits plan.  It alleges

20  breach of fiduciary duty and breach of contract.  This court

21  previously recognized that it was unclear whether ERISA governs

22  this case in light of the possibility that the Plan is a

23  "foreign plan" excluded by ERISA.  Order filed July 7, 2003.

24  The court ordered that additional discovery be conducted

25  on this issue.  Defendants have now submitted a special motion

26  for summary judgment regarding lack of jurisdiction which

                                  1

1  plaintiff opposes.

2  **I.**

3  **FACTS**

4  Plaintiff, the personal representative of Mohammed Lasheen

5  ("Lasheen"), seeks to recover healthcare benefits under the

6  Plan.  Lasheen's claim for benefits was either denied or

7  ignored, apparently leading to his death.  Faramawi Dec. at ¶13;

8  Pl.'s Compl., Andrus Dec., Exs. D-F.  The Plan was provided by

9  the Embassy of Egypt to students and teachers who were

10  temporarily in the United States as "F" or "J" visa holders.

11  Hayes Dec. at ¶2, Ex. A at 0021; Faramawi Dec. at 6.  The Plan

12  provides that one of the eligibility requirements is that the

13  participant "[has] neither received nor applied for

14  naturalization or permanent residency status in the United

15  States, Puerto Rico, or Canada, or for any other change [in

16  immigration] status in the United States as an 'F' or 'J' visa

17  holder."  Hayes Dec. at ¶2, Ex. A at 0021.

18  The Plan was established by the Embassy of Egypt which also

19  acted as the Plan Administrator.  Hayes Dec. at ¶ 3, Ex. B;

20  Faramawi Dec. at ¶3.  It is disputed, however, whether defendant

21  Loomis was also acting as the Plan's administrator and fiduciary

22  and whether Loomis had any final decision-making authority.  See

23  Andrus Dec., Ex. E.  There is no evidence in the record before

24  the court that a formal plan trustee was ever named.

25  Loomis was the benefits services manager of the Plan.

26  Declaration of Debbie Hayes ("Hayes Dec.") at ¶3, Ex. B;

2

1  Declaration of Randy Andrus at ¶¶5-6, Ex. D (letter from The

2  Loomis Company dated Nov. 3, 2000, which states "[p]lease be

3  advised that the health benefits program for the Cultural and

4  Educational Bureau of the Embassy of the Arab Republic of Egypt

5  is a qualified, self-funded ERISA benefit plan.").  The parties

6  dispute whether Loomis was also acting as the Plan's

7  administrator as well, either alone or in conjunction with the

8  Embassy of the Arab Republic of Egypt.  See Hayes Dec. at ¶3,

9  Ex. B (explaining that the Benefit Services Manager, Loomis,

10 would "provide the administrative services listed herein");

11 Andrus Dec. at ¶4-5, Ex. D. (letter from The Loomis Company

12 dated Nov. 3, 2000, which provides that "[t]he Loomis Company is

13 a Third Party Administrator ("TPA") that administers these

14 benefits on behalf of and at the pleasure of the Embassy.").

15   The Embassy of Egypt Cultural and Educational Bureau is

16 located at 1303 New Hampshire Avenue in Washington, D.C. and

17 that property is owned by the Egyptian Government.  Hayes Dec.

18 at 4; Faramawi Dec. at 4, Declaration of Kathleen E. Dyer ("Dyer

19 Dec.) at 1-2, Exs. A-B.  Plaintiff disputes, however, whether

20 the Cultural and Educational Bureau is the same as the Embassy

21 of Egypt, whose official address appears to be different.

22 Declaration of Ross Taggart at ¶¶2-3.

23 ////

24 ////

25 ////

26 ////

3

## II.

### STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

1  immaterial."  Id.   In such a circumstance, summary judgment

2  should be granted, "so long as whatever is before the district

3  court demonstrates that the standard for entry of summary

4  judgment, as set forth in Rule 56(c), is satisfied."  Id. at

5  323.

6      If the moving party meets its initial responsibility, the

7  burden then shifts to the opposing party to establish that a

8  genuine issue as to any material fact actually does exist.

9  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

10  586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.

11  Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

12      In attempting to establish the existence of this factual

13  dispute, the opposing party may not rely upon the denials of its

14  pleadings, but is required to tender evidence of specific facts

15  in the form of affidavits, and/or admissible discovery material,

16  in support of its contention that the dispute exists.  Fed. R.

17  Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First

18  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

19  (9th Cir. 1998).  The opposing party must demonstrate that the

20  fact in contention is material, i.e., a fact that might affect

21  the outcome of the suit under the governing law, Anderson v.

22  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

23  No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347,

24  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

25  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

26  that the dispute is genuine, i.e., the evidence is such that a

1  reasonable jury could return a verdict for the nonmoving party,

2  Anderson, 477 U.S. 248-49; see also Cline v. Industrial

3  Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228

4  (9th Cir. 1999).

5       In the endeavor to establish the existence of a factual

6  dispute, the opposing party need not establish a material issue

7  of fact conclusively in its favor.  It is sufficient that "the

8  claimed factual dispute be shown to require a jury or judge to

9  resolve the parties' differing versions of the truth at trial."

10 First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv.,

11 809 F.2d at 631.  Thus, the "purpose of summary judgment is to

12 'pierce the pleadings and to assess the proof in order to see

13 whether there is a genuine need for trial.'"  Matsushita, 475

14 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

15 note on 1963 amendments); see also International Union of

16 Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

17 Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

18      In resolving the summary judgment motion, the court

19 examines the pleadings, depositions, answers to interrogatories,

20 and admissions on file, together with the affidavits, if any.

21 Rule 56(c); See also In re Citric Acid Litigation, 191 F.3d

22 1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

23 is to be believed, see Anderson, 477 U.S. at 255, and all

24 reasonable inferences that may be drawn from the facts placed

25 before the court must be drawn in favor of the opposing party,

26 see Matsushita, 475 U.S. at 587 (citing United States v.

1  <u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>See also</u>

2  <u>Headwaters Forest Defense v. County of Humboldt</u>, 211 F.3d 1121,

3  1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

4  out of the air, and it is the opposing party's obligation to

5  produce a factual predicate from which the inference may be

6  drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp.

7  1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th

8  Cir. 1987).

9        Finally, to demonstrate a genuine issue, the opposing party

10 "must do more than simply show that there is some metaphysical

11 doubt as to the material facts. . . . Where the record taken as

12 a whole could not lead a rational trier of fact to find for the

13 nonmoving party, there is no 'genuine issue for trial.'"

14 <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

**III.**

**ANALYSIS**

17       Federal question jurisdiction over this matter requires

18 that ERISA apply.  28 U.S.C. § 1331.  ERISA excludes from its

19 provisions plans which are "maintained outside of the United

20 States primarily for the benefit of persons substantially all of

21 whom are nonresident aliens."  29 U.S.C. § 1003(b)(4).  The

22 question thus before the court is whether the plan in question

23 is excluded from ERISA coverage by virtue of this provision.

24       The Plan provides that one of the eligibility requirements

25 is that the participant "[has] neither received nor applied for

26 naturalization or permanent residency status in the United

States, Puerto Rico, or Canada, or for any other change [in immigration] status in the United States as an 'F' or 'J' visa holder."  Hayes Dec. at ¶2, Ex. A at 0021.  The Plan exclusively benefits non-resident aliens.  Accordingly, since it is clear that the Plan is "primarily for the benefit of persons substantially all of whom are nonresident aliens," one of the requisites for exclusion under 29 U.S.C. § 1003(b)(4) is satisfied.

The remaining question is whether the Plan is "maintained outside of the United States."  29 U.S.C. § 1003(b)(4).  Neither the parties nor this court have discovered any cases which interpret what it means to be "maintained outside of the United States."  There are, however, a number of opinion letters from the Office of Pension and Welfare Benefit Programs ("OPWBP") and from the Pension Benefit Guaranty Corporation ("PBGC").  The court gives such weight to these opinion letters as they have persuasive value.  Christensen v. Harris County, 529 U.S. 576, 587 (2000).  Unfortunately, the letter opinions provide little analysis or explanation behind the conclusions they declare.

The court can infer from the opinion letters certain characteristics which appear to have guided the agencies in their conclusions.  They are:

(1) "All plan records concerning participation accrual, vesting and other matters necessary to determine and pay Plan benefits are maintained outside the United States."  Opinion No. 83-27A; PBGC Opinion 80-19; see also Opinion 82-38A

1  ("centralized information and records concerning the fund" were

2  stored outside the country); PBGC Opinion 80-19.

3       (2)  The work locations of the employees was outside of the

4  United States. . . ."  Opinion No. 83-27A; PBGC Opinion 80-19

5  ("one of the factors to which the PBGC will attach particular

6  weight is the work location of the employees covered by the

7  plan"); Opinion No. 80-61 A ("all participants are currently

8  employed outside of the United States"); PBGC Opinion 78-14.

9       (3)  The Plan is administered by a company located outside

10  the United States.  Opinion No. 80-61 A.

11       (4)  All operations of the companies are located outside of

12  the United States.  Opinion No. 81-58A.

13       (5)  The trust is established outside the United States.

14  PBGC Opinion 78-14.

15       (6)  Assets of the Plan are held outside the United States.

16  Opinion No. 80-61A.

17       These characteristics appear to the court to be reasonably

18  applicable to resolution of the issue at bar.  Accordingly, the

19  court will use them to help analyze whether the Plan is exempt

20  from ERISA.

21       Defendants claim that all the records which may have been

22  kept at the Embassy of Egypt Cultural and Educational Bureau in

23  Washington, D.C. should be considered outside of the United

24  States because they are located on what defendants characterize

25  as "diplomatic property."  I agree that diplomatic properties

26  are generally treated as foreign territory.  See, e.g., United

1  States v. Corey, 232 F.3d 1166, 1182-83 (9th Cir. 2000) (under

2  Vienna Convention embassy land is inviolable and a host country

3  may not enter embassy land without consent of sending state;

4  Vienna Convention on Diplomatic Relations, Apr. 18, 1961, art.

5  22, 23 U.S.T. 3227); Gerritsen v. De La Madrid Hurtado, 819 F.2d

6  1511, 1517 (9th Cir. 1987) (for purposes of Foreign Sovereign

7  Immunities Act, Mexican Consulate fell within the definition of

8  foreign state); Federation for American Immigration Reform v.

9  Klutznick, 486 F.Supp. 564, 567 (D.D.C. 1980) (for purpose of

10 census, diplomatic personnel living on embassy grounds are not

11 counted because grounds are considered "foreign soil").

12      Plaintiff, in response, notes that the Embassy of Egypt is

13 located at a different address than the Cultural and Educational

14 Bureau.  It argues as a consequence that the Cultural Bureau

15 should not be given the same status provided to the embassy

16 itself.

17      It does appear that the primary headquarters of the

18 Egyptian Embassy is located at 3521 International Ct. NW,

19 Washington DC 20008 and not at 1303 New Hampshire Avenue,

20 Washington D.C., which is the location of the Cultural and

21 Educational Bureau.  See Declaration of Ross Taggart at ¶¶2-4;

22 Official Website of the Embassy of Egypt,

23 http://www.egyptembassy.us/ (last visited Feb. 15, 2006) (the

24 website provides 3521 International Ct. as the embassy address);

25 Website of the Egyptian Cultural and Educational Bureau,

26 http://www.eceb.us/ (last visited Feb. 15, 2006) (the website

1   provides 1303 New Hampshire Avenue as the Bureau's address).  As

2   I explain, however, this fact is not determinative.

3       Article 1(i) of the Vienna Convention defines the "premises

4   of the mission" as the "buildings or parts of buildings and the

5   land ancillary thereto, irrespective of ownership, used for the

6   purposes of the mission including the residence of the head of

7   the mission."  23 U.S.T. 3227.  Article 24 states that the

8   "archives and documents of the mission shall be inviolable at

9   any time and wherever they may be."  Id.  Included in the

10  functions of a diplomatic mission are activities which promote

11  "friendly relations between the sending State and the receiving

12  State, and developing their economic, cultural and scientific

13  relations."  23 U.S.T. 3227, Article 3(1)(e).  The website of

14  the Cultural Bureau explains that it serves both cultural and

15  educational functions by putting on various artistic, political,

16  and education events while also serving as a coordinator for

17  Egyptian graduate students studying in the United States.  See

18  "About ECEB" at http://www.eceb.us/aboutUs.html (last visited

19  Feb. 15, 2006).[1]  These facts and the evidence provided by

20  defendants that the Bureau's offices are owned by Egypt, require

21  that the Bureau should be considered a diplomatic property.

22      It is not clear from ERISA whether the statute meant to

23  exclude plans maintained at diplomatic properties within the

24  United States.  The definitions section of ERISA provides that

25  _____

26      [1]  The court believes that the information contained in the
    web sites is subject to judicial notice.

11

1  the "term 'United States' when used in the geographic sense

2  means the States and the Outer Continental Shelf lands defined

3  in the Outer Continental Shelf Lands Act" and the term "State"

4  includes "any State of the United States, the District of

5  Colombia, Puerto Rico, the Virgin Islands, American Samoa, Guam,

6  Wake Island, and the Canal Zone."  An ordinary reading of 29

7  U.S.C. § 1002(10) would suggest it was, at least to some degree,

8  speaking in a geographic sense.  Nonetheless, the definition of

9  the United States does not resolve the present dilemma.

10      Unsurprisingly, none of the opinion letters adverted to

11 above, address defendants' contention.  There is one letter,

12 however, that is somewhat close in its factual scenario.  The

13 Coordination Council for North American Affairs, CCNAA ,"is the

14 unofficial representative of the people of Taiwan established

15 pursuant to Section 10 of the Taiwan Relations Act (TRA).  See

16 22 U.S.C. § 3309."  Id.  As described by the OPWBP, the CCNAA

17 "has been considered to have the status of a foreign state for

18 purposes of the Foreign Sovereign Immunities Act of 1976."

19 Opinion No. 93-10A.

20      The CCNAA was proposing to establish a medical plan for its

21 employees who were resident in the United States.  Those covered

22 would include citizens of Taiwan, the United States and

23 individuals with dual citizenship.  Id.  CCNAA wrote to ask the

24 OPWBP whether the plan it was developing for its employees would

25 be included in Title I of ERISA.  Id.  The OPWBP found that the

26 medical plan would not fall within the category of exempt plans

because section 4(b) "does not expressly exempt plans established or maintained by foreign governments from coverage under Title I." Id.[2]  This conclusion would appear to support plaintiff's position that the plan at issue should not be exempt merely because the Egyptian government established the plan and stored the records at a possible diplomatic property.[3]

Indeed, even if the court treats the Embassy as diplomatic property, it does not necessarily dispose of the issue.  Loomis claims that their factual investigation has shown that "all original records concerning participation, accrual, vesting and other matters necessary to determine and pay Plan benefits" were maintained at the Bureau.  Loomis' proof for the assertion is the declaration of Debbie Hayes, who is the Vice President of The Loomis Company.  Hayes Dec. at ¶1.  She declares that "[a]ll of the records concerning participation accrual, vesting and other matters necessary to determine and pay Plan benefits were maintained at the Embassy of Egypt Cultural and Educational Bureau in Washington, D.C.." Id. at ¶5.

Plaintiff, however, points to the Benefit Services Management Agreement (BSMA), from which it may be inferred that

_____

[2]  The OPWBP did note, however, that it did not express a view on whether sovereign immunity could be used as a defense under FSIA.

[3]  This conclusion is somewhat undermined by the fact that the opinion letter contains no information on whether the documents were to be maintained at the embassy or elsewhere.

at least some of the documents relating to the Plan had to have
come through, and possibly be stored at the offices of Loomis.
For example, the BSMA provides that Loomis shall "prepare the
Benefit Plan Document," "prepare and print descriptive booklets
for the Benefit Plan participants," "provide suitable
facilities, personnel, procedures, forms and instructions to
facilitate the administration of claims," "determine, in
accordance with the Benefit Plan and generally accepted claims
administration procedures and practices, the qualifications of
claims submitted, making, as required," "furnish the employer
information that the Employer deems essential with respect to
the Benefit Plan and procedures thereunder and assist in
distribution of material furnished," and "furnish the employer
with a copy of each claim check", etc.  Hayes Dec., Ex. B at
0001-0003.  Plaintiff also tenders a letter from The Loomis
Company which requests that certain medical documents be sent
directly to Loomis.  Badry Dec., Ex. C.

There is no question that the Loomis Company headquarters
are not diplomatic property nor is there any question that its
headquarters are located in the United States.  It thus appears
to be, at the very least, a disputed material fact whether the
"records concerning participation accrual, vesting and other
matters necessary to determine and pay Plan benefits" were all
maintained at the Bureau.

As noted above, under the opinion letters, various other
factors bear on the question at issue.  One is whether the

trustee is outside of the United States.  Defendants claims that
no trustee was ever named, while plaintiff claims that the
Loomis Company was named and acted as a fiduciary and trustee.

ERISA provides that trustees are to be "either named in the
trust instrument or in the plan instrument described in section
1102(a) of this title or appointed by a person who is a named
fiduciary. . . ."  29 U.S.C. § 1003(a).  The documents which
plaintiff cites do not clearly establish whether a trustee was
designated.  The BSMA, however, provides that the "[e]mployer
retains all final authority and responsibility for the
administration and operation of the Benefit Plan as its named
fiduciary within the meaning of Section 402(a)" of ERISA.  Hayes
Dec., Ex. B at 0001.  While the BSMA would not appear to be
dispositive, it is some evidence bearing upon the issue.

Another characteristic derived from the opinion letters is
whether the assets of the Plan are held outside the United
States.  Plaintiff purports to dispute whether all the funds
came from Egypt but has provided no evidence of this.  From all
that appears, the funds originated in Egypt.

The opinion letters highlight as a factor whether the
employees were working within the United States.  <u>See</u> Opinion
No. 83-27A; PBGC Opinion 80-19; Opinion No. 80-61 A; PBGC
Opinion 78-14.  It appears from eligibility criteria that the
Plan was designed to benefit primarily, if not exclusively,
students and teachers who were engaged in learning or teaching
in the United States.  Thus, despite their status as Egyptian

nationals, they were in the United States during the period they were covered by the Plan.  Unlike the matter at bar, most of the opinion letters address plans where most of those covered were not working in the United States.  For example, in letter 80-19, the PBGC found that the plan's administrator was in California and all of the plan's assets were held by a company in California, but all the plan records were stored in Hong Kong and the plans participants were all non-resident aliens.  Seeing that the factors pointed in two directions, the PBGC put "particular weight" on the fact that the work location of the employees was outside of the United States in finding that the plan was exempt.  PBGC letter 80-19; see also PBGC letter 78-14 (the company was a United States corporation with principal offices in New York, but "all participants in these plans work and reside in Canada."); Opinion No. 80-61A.

Attempting to apply the criteria derived from the opinion letters to the evidence adduced does not result in a certain result.  Moreover, as noted above, the opinions only have persuasive value.  Christensen v. Harris County, 529 U.S. 576, 587 (2000).  In the matter at bar, two other factors not discussed in the opinion letters appear to the court to carry considerable weight.

////

////

////

////

1    First, the Plan, in unambiguous language, declares itself

2 an ERISA plan.[4]  There is, to say the least, something appealing

3 about taking the Plan at its word.

4    Second, it appears to this court that where most of the

5 activities of the Plan were carried out should be significant.

6 In this regard, it is clear from plan documents and the letters

7 between plaintiff and defendant, that Loomis was doing most of

8 the administration of the Plan.  Moreover, Loomis represented

9 itself as the administrator of the Plan in a letter sent to the

10 plaintiff's attorney dated Nov. 3, 2000.  The letter reads:

> Please be advised that the health benefits program for
> the Cultural and Educational Bureau of the Embassy of
> the Arab Republic of Egypt is a qualified, self-funded
> ERISA benefit plan.
>
> The Loomis Company is a Third Party Administrator
> ("TPA") that administers these benefits on behalf of
> and at the pleasure of the Embassy.  As a TPA we are
> not the plan fiduciary.  Our responsibility is to
> administer the benefits program as written.

17 Andrus Dec., Ex. E.

18    The plan description also contains a section entitled

19 "Rights and Protections" which sets out certain rights and

20 protections provided under ERISA.  These items alone do not make

21 ERISA applicable.  Nonetheless, in a case such as this, where

22 the court is attempting to interpret an ambiguous statutory

23 provision, the evidence of significant activity in the United

_____

25    [4] Moreover, for most intents and purposes, the Loomis Company
appears to have believed it was an ERISA plan until midway through
26 this litigation.

17

States is a relevant indicator of the Plan's location.

The court notes that the BSMA provides that the provisions of the plan shall be enforced under the laws of the Commonwealth of Pennsylvania.  Hayes Dec., Ex. B at 0005.  Plaintiff cites to the Foreign Service Immunities Act (FSIA) which decrees that a foreign state shall not be immune from the jurisdiction of the courts of the United States if the "foreign state has waived its immunity either explicitly or by implication."  28 U.S.C. § 1605(a)(1).  It seems that this factor should be given little weight. First, given the fact that the dispute is whether the plan at issue is an ERISA plan it seems clear that federal law governs.  Second, the issue is not immunity, but statutory construction.  Nonetheless, agreeing to submission to the law of a state of this nation is at least suggestive that the plan was not maintained in Egypt.

**IV.**

**CONCLUSIONS AND ORDERS**

After a review of the factors highlighted in the opinion letters and other considerations, it appears that summary judgment must be and is DENIED for defendants.  The court concludes that the exception for foreign plans set out in § 1003(b)(4) is not applicable to this case.

////

////

////

////

1        Being a case of first impression that could be controlling

2   on the case, the court will certify for interlocutory appeal

3   pursuant to 28 U.S.C. § 1292(b) the question of whether this

4   plan falls under  29 U.S.C. § 1003(b)(4)).  Any such appeal

5   shall be taken within ten (10) days of the date of this order.

6        IT IS SO ORDERED.

7        DATED:  March 9, 2006.

8                                    /s/Lawrence K. Karlton
                                     LAWRENCE K. KARLTON
9                                    SENIOR JUDGE
                                     UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26